785 So.2d 539 (2001)
KAELBEL WHOLESALE, INC., a Florida corporation, Appellant,
v.
Pamela SODERSTROM, Appellee.
No. 4D99-406.
District Court of Appeal of Florida, Fourth District.
February 21, 2001.
Rehearing Denied June 7, 2001.
*541 Gilbert E. Theissen of Heinrich Gordon Hargrove Weihe & James, P.A., Fort Lauderdale, for appellant.
Arnold R. Ginsberg of Ginsberg & Schwartz, Robert J. Bryan, P.A., and Lance R. Stelzer, Miami, for appellee.
WARNER, C.J.
We are confronted in this appeal with the question of whether the trial court erred in allowing expert evidence under the standard of Frye v. United States, 293 F. 1013 (App.D.C.1923). Appellant contends that the evidence did not meet the Frye test requirement that it be generally accepted in the relevant scientific community. Particularly, the experts' testimony linked appellee's ciguatera poisoning, which she contracted from fish supplied to a restaurant by appellant, to her development *542 of Guillain-Barré Syndrome ("GBS"), a neurological disorder. We conclude that the testimony did not meet the Frye test and reverse the final judgment.

I. Biological Explanation of Ciguatera and Guillain-Barré Syndrome

Appellee, Pam Soderstrom, had dinner at a restaurant in Fort Lauderdale, consuming snapper for her main course. Shortly after dinner, she noticed a tingling sensation in her left hand. She continued her evening activities and then went to bed. During the night, her sleep was interrupted by an upset stomach and some mild diarrhea. The next day the "pins and needles" sensation continued, now in both hands, but the intestinal problems subsided. By late the next day, with the symptom still persisting, she became alarmed, as the tingling was in both arms and both legs. She visited a hospital emergency room, where a doctor suspected that she had suffered ciguatera poisoning, based upon her symptoms and her history of consuming fish two days before. Appellant's brief explains:[1]
Ciguatera is the name given to as many as twenty different naturally occurring marine toxins produced by tropical algae. Although it has been known since the early sixteenth century, it first acquired a name in the late eighteenth century when a Portuguese biologist in Cuba first recorded intoxication following the consumption of a "cigua" or turban shellfish. These toxins can be found in hundreds of different species of fish and are thought to bioaccumulate up the food chain as small marine organisms ingest the algae and are, in turn, eaten by larger and larger fish. The toxins are tasteless, odorless and unaffected by cooking or freezing.
Since ciguatoxin is acquired by ingestion, gastrointestinal disturbances, such as vomiting, abdominal cramping and diarrhea are usually the earliest symptoms to appear. These symptoms generally last a day or two and are commonly followed by disturbances to the sensory nervous system. These disturbances consist of paresthesias (numbness and tingling) in the extremities, dyesthesias (reversal of hot and cold sensation) and gustatory paraesthesias (food tasting metallic). Ciguatera causes these sensory disturbances by interfering with structures in the nerve cell called sodium (Na+) channels.
Nerve cells have a fibrous covering called myelin which, in some respects[,] is similar to the insulation around an electrical wire. However, unlike an electrical wire, the myelin covering is not continuous. Instead, at regular intervals, there are gaps in the myelin where structures called Nodes of Ranvier are located. These Nodes act like relay stations and continually reamplify the neural impulse as it travels along the nerve. They accomplish this by means of a controlled influx of sodium (Na+) ions coupled with a corresponding outflux of potassium (K+) ions through microscopic channels in the cellular membrane. These sodium (Na+) and potassium (K+) channels are, for the most part, located at the Nodes of Ranvier and, through a controlled opening and closing of these channels, the nerve impulse, which would otherwise continue to weaken, is reamplified and then sent along the nerve to the next Node. There the process is repeated and, in this fashion, the impulse is transmitted along the entire length of the nerve.

*543 Ciguatera causes sensory disturbances when the molecules of the toxin attach themselves to the sodium (Na+) channels at the Nodes of Ranvier. When the ciguatoxin molecules bind to the sodium (Na+) channels, they have the effect of locking these channels open and this, in turn, places the nerve in a constant state of activation. Because of the continual stimulation, the nerve discharges repeatedly, giving rise to numbness, tingling, and a variety of other abnormal sensations.
In appellee's case, her symptoms were mild, and the doctor did not admit her to the hospital. The next day she saw another doctor, who prescribed an IV infusion of Mannitol, which usually is effective in reducing the symptoms of ciguatera. However, the drug had no effect on appellee's symptoms, and in fact they began to worsen, experiencing weakness in both of her legs. As the symptoms increased, even after a second Mannitol treatment, she realized that she was losing all strength and needed hospitalization. By the time she was admitted, she was paralyzed from the waist down. At that point, the doctors diagnosed her as suffering from GBS.
As appellant observes in its brief:
Guillain-Barré Syndrome ("GBS") is a neurological disorder which usually attacks motor nerves and is currently the most common cause of acute generalized paralysis. GBS was first described more than one hundred years ago and was initially called Landry's Ascending Paralysis because of a characteristic pattern of weakness and paralysis starting in the lower extremities and, over a matter of days, ascending up the body. In severe cases, it may affect respiration and even eye movement. In Plaintiffs case, she was in Intensive Care for almost three weeks, paralyzed from the waist down and unable to even control her eyelids. It [the paralysis] was unquestionably "the most disabling part of her problem."
GBS affects a different part of the nerve than ciguatera. Instead of disrupting the flow of sodium (Na+) ions through the sodium channels, GBS attacks the myelin sheath and is therefore referred to as one of many "demyelinating" neuropathies. Like the insulation around a wire, the myelin helps to preserve the strength of the nerve impulse as it travels along the nerve. When the myelin sheath of a motor nerve becomes damaged, the impulse is no longer conducted normally. This, in turn causes weakness, and when the damage is severe paralysis.
Although our knowledge of this disease is still evolving, the current view is that GBS is the result of an aberrant auto-immune response to certain events, usually bacterial or viral infections, which precede the onset of this disease by one to four weeks. It has long been known that the body defends itself against bacterial and viral invasions by producing antibodies which target and attack these invaders, and, it is now believed by some, that the destruction of the myelin (demyelinization) seen in GBS is the result of an aberrant antibody response to these infections or other stimuli which provoke an immunologic response.
Since GBS has been recognized for more than a hundred years, the list of known or suspected antecedent events to GBS is quite extensive. Even so, the cause of GBS is not always known, and even today, roughly one-third of GBS cases are considered idiopathic. Although ciguatera has never been suspected as a cause of GBS, a diarrhea causing bacteria called campylobacter jejuni, and a viral infection known as *544 cytomegalovirus ("CMV") have both long been known as precursors to this disease. Interestingly enough, aside from plaintiff's previously mentioned bout with diarrhea, hospital tests performed after her admission for GBS revealed the presence of an earlier CMV infection.
After appellee made some level of recovery, she filed suit against appellant alleging that it had supplied the fish to the restaurant, that the fish was defective, having contained the ciguatera toxin, and that the ciguatera toxin had caused the GBS. Prior to trial, appellant moved to exclude appellee's expert testimony as to the causal link between ciguatera and GBS, alleging that this was a novel theory and not generally accepted within the relevant scientific community, thus inadmissible under Frye. Although the motion was initially denied, appellant renewed it prior to trial. Rather than interrupt the trial with a series of Frye hearings, the court decided to listen to the expert evidence as it was presented to the jury and make its ruling at the close of the evidence. Ultimately, the court reserved ruling and submitted all issues to the jury. The jury returned a verdict in appellee's favor, and, post-trial, the court denied the motions for judgment notwithstanding the verdict, prompting this appeal in which appellant claims that appellee's experts' testimony did not meet the Frye test.

II. Expert Testimony

Appellee presented two experts, the first of whom was Dr. Robert Lange, an internist specializing in the field of epidemiology, which is the study of diseases in populations rather than individuals. He considered himself an expert on ciguatera but not on GBS, with which he had no clinical experience. While he conceded that ciguatera has never been associated with GBS in any medical or scientific literature, Dr. Lange still opined that ciguatera poisoning caused appellee's GBS based upon his explanation of how such causation might occur in the body. He first explained how ciguatera affected the nerves of the body, which explanation was consistent with what has been previously set forth in this opinion. He postulated that after prolonged activation of the sodium channels by the ciguatera toxin, the sodium channel is "probably" distorted, and its shape is affected. (Emphasis added). The sodium channel is made of proteins, and when there are abnormal proteins in the body, the body forms antibodies against these abnormalities. These antibodies are then directed against the sodium channels themselves. This mimicry of the antibodies attaching to the sodium channels can lead to the equivalence of demyelinization and acute demyelinating polyneuropathy, or GBS. Dr. Lange also based his opinion as to specific causation on the temporal proximity of the ciguatera poisoning and the onset of GBS symptoms.
Dr. Lange was not able to point to any scientific literature that would show his theory was generally accepted in the scientific community. Importantly, no corroborating evidence supported his thesis that antibodies would be created in response to the prolonged channel activation caused by ciguatera. While he referred to six articles, none lent direct support to his theory. In fact, even the ones tending to support his theory of how ciguatera can cause GBS, described the theory as "speculative" and that "[t]he roles of molecular mimicry, and of `bystander' effects, in triggering the production of such antibodies are not understood." Stephen G. Waxman, Sodium Channel Blockade by Antibodies: A New Mechanism of Neurological Disease?, 37 Annals of Neurology 421, 421-22 (1995) (emphasis added); see also Case Records of the Massachusetts General Hospital, *545 Weekly Clinicopathological Exercises, New. Eng. J. Med., Apr. 23, 1998, at 1212.
Although specializing in the field, Dr. Lange provided no epidemiologic studies relating to ciguatera poisoning to GBS. In fact, no such case has ever been reported in the literature.
Contrary to Dr. Lange's testimony, Dr. Raymond Lopez, a neurologist and appellee's second expert, testified that the body creates antibodies that attach to both the ciguatoxin and the sodium channel. In this process, the antibodies cause destruction of the myelin sheath around the nerve, resulting in increased numbness. This process is known as "molecular mimicry." He testified that these underlying principles have been tested and are accepted in the relevant scientific community. He referred to examples of vaccine injections, insect bites, snake bites, and other instances in which scientists have concluded that toxins have caused GBS. He admitted, however, that this was the first time he knew that someone had opined that ciguatera causes GBS. He further admitted that it was possible that appellee had GBS "percolating" in her body, and it manifested itself as a result of CMV, a known antecedent illness to GBS for which appellee had tested positive. Dr. Lopez admitted that it is not a generally accepted practice to base an opinion of causation solely on a temporal relationship between the toxin and the disease.
Appellant also presented two experts on the issue. Dr. Daniel Baden, a professor of marine biology with a specialty in molecular neurotoxicology, testified that appellee's experts based their opinions on principles that are not generally accepted in the relevant scientific community. He stated that when the ciguatoxin enters the body, it binds to the sodium channel at the node of Ranvier (where there is no myelin); it does not attach itself to the myelin (as Dr. Lopez had suggested). Moreover, the ciguatoxin opens the sodium channel, it does not block it, and because the toxin enters the node of Ranvier, it is not exposed enough for the body to detect it and create an antibody. A causal link between ciguatera and GBS has never been found. Dr. Baden further testified that the fact that appellee's condition worsened after receiving Mannitol (a common treatment for ciguatera poisoning) demonstrated that appellee did not suffer from ciguatera poisoning.
Dr. Ram Ayyar was also called by appellant as an expert. He is a medical doctor, board certified in neurology, with a subspecialty in neuromuscular disease. He has written articles on ciguatera and has treated patients with ciguatera and patients with GBS. Dr. Ayyar opined that appellee did not contract GBS as a result of ciguatera poisoning, but rather the "triggering factor" was probably a recent CMV infection she had experienced. In support of this opinion, he pointed to medical tests indicating that the CMV infection was in her system. He also pointed to the fact that the Mannitol treatment actually worsened appellee's condition; he had never seen a ciguatera patient worsen after receiving Mannitol. He further testified that there is no underlying scientific or medical principle recognized that supports a cause and effect relationship between ciguatera and GBS. Ayyar performed an independent medical examination on appellee and concluded that while her subjective personal history as related to him by her was consistent with ciguatera poisoning, the nursing chart created on the day appellee was admitted to the hospital reflects a different history.
Responding to the appellee's experts' theories, he testified that the idea that an antibody is created that somehow attacks the nerve is not supported by the relevant *546 scientific community. First, the body does not create an antibody to the ciguatoxin because the toxin goes into the sodium channel where it is undetected by the immune system. Moreover, the GBS started too soon after the ciguatera poisoning for the ciguatera to have caused the GBS. On cross-examination, he admitted that the first symptoms of GBS can be seen one to four weeks after the onset of the preceding illness. In this case, appellee was diagnosed with GBS exactly one week after she ate the snapper meal. Dr. Ayyar also admitted that many people can be positive for CMV yet not develop GBS.

III. Analysis of Frye Issue

We review de novo a trial court's determination to admit expert scientific testimony. See Hadden v. State, 690 So.2d 573, 579 (Fla.1997); Brim v. State, 695 So.2d 268, 274 (Fla.1997).[2]See also E.I. DuPont De Nemours & Co. v. Castillo, 748 So.2d 1108, 1115 (Fla. 3d DCA), rev. granted, No. SC00-490 (Fla. Aug.31, 2000). When dealing with the issue of admissibility of new or novel scientific evidence, the proponent of the evidence must adhere to the "general acceptance test" required by Frye. See Ramirez v. State, 651 So.2d 1164 (Fla.1995). See also Castillo, 748 So.2d at 1114.
In Brim v. State, 695 So.2d 268 (Fla.1997)("Brim I"), the supreme court reiterated its acceptance of the Frye test to guarantee the reliability of novel or new scientific evidence. "This standard requires a determination, by the judge, that the basic underlying principles of scientific evidence have been sufficiently tested and accepted by the relevant scientific community." Id. at 272. In commenting on what general acceptance of the relevant scientific community means, the court stated:
It is clear that scientific unanimity is not a precondition to a finding of general acceptance in the scientific community. People v. Dalcollo, 282 Ill.App.3d 944, 218 Ill.Dec. 435, 445, 669 N.E.2d 378, 387 (1996). Instead, general acceptance in the scientific community can be established "if use of the technique is supported by a clear majority of the members of that community." People v. Guerra, 37 Cal.3d 385, 208 Cal.Rptr. 162, 183, 690 P.2d 635, 656 (1984). "Of course, the trial courts, in determining the general acceptance issue, must consider the quality, as well as quantity, of the evidence supporting or opposing a new scientific technique. Mere numerical majority support or opposition by persons minimally qualified to state an authoritative opinion is of little value...." People v. Leahy, 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 678, 882 P.2d 321, 336-37 (1994). Therefore, while a "nose count" is not alone sufficient to establish general acceptance in the scientific community, such acceptance likewise need not be predicated upon a unanimous view.
Id. In discussing the function of the appellate court in its de novo review, Judge Altenbernd explained:
the Frye standard is not a direct measure of scientific trustworthiness. Instead, it is based on the assumption that the science will be trustworthy if scientists worthy of trust have published articles and made public statements in support of the scientific principle or procedure. Frye does not contemplate review *547 of the scientific literature to determine whether the science in this case is "good" science or is reliable from a scientific perspective. Such a review would simply be a Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] analysis at the appellate level.
Brim v. State, 779 So.2d 427 (Fla. 2d DCA 2000)("Brim II") (citation and footnote omitted).
Finally, as Judge Altenbernd noted, "the trial court cannot base its decision to accept scientific testimony purely on the credibility of an expert witness who does not explain his or her reasoning in considerable detail. Due to the unusual de novo standard of review, this court is not authorized to defer to the trial court on these issues." Id. at 427.
Appellee posits, however, that this case does not concern expert scientific evidence, but rather "pure opinion," which does not require Frye testing. In Flanagan v. State, 625 So.2d 827, 828 (Fla.1993), in discussing profile evidence, the supreme court explained the difference between opinion testimony, which is not required to meet Frye standards, and scientific evidence:
not all expert testimony must meet this [Frye] test in order to be admissible. As discussed by Judge Ervin below, 586 So.2d at 1109-11, pure opinion testimony, such as an expert's opinion that a defendant is incompetent, does not have to meet Frye, because this type of testimony is based on the expert's personal experience and training. While cloaked with the credibility of the expert, this testimony is analyzed by the jury as it analyzes any other personal opinion or factual testimony by a witness. Profile testimony, on the other hand, by its nature necessarily relies on some scientific principle or test, which implies an infallibility not found in pure opinion testimony. The jury will naturally assume that the scientific principles underlying the expert's conclusion are valid. Accordingly, this type of testimony must meet the Frye test, designed to ensure that the jury will not be misled by experimental scientific methods which may ultimately prove to be unsound. See Stokes, 548 So.2d at 193-94 ("[A] courtroom is not a laboratory, and as such it is not the place to conduct scientific experiments. If the scientific community considers a procedure or process unreliable for its own purposes, then the procedure must be considered less reliable for courtroom use.").
625 So.2d at 828. See also Florida Power & Light Co. v. Tursi, 729 So.2d 995 (Fla. 4th DCA 1999). Frye states that "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014. Indeed, as noted in Berry, the weight of authority holds that what must be Frye tested are the underlying scientific principles or methodology upon which the opinion is based. 709 So.2d at 566. Berry holds that "when the expert's opinion is well-founded and based upon generally accepted scientific principles and methodology, it is not necessary that the expert's opinion be generally accepted as well." Id. at 567.
In the instant case, the testimony of appellee's experts as to the causation of GBS by the ciguatera was not based upon personal experience or training. Instead, it was based upon scientific principles to reach the opinions and conclusions drawn. This scientific methodology was required to meet the Frye test.

IV. Evaluation of Expert Testimony Under Frye Principles

Applying these standards to the evidence presented, we conclude that the *548 scientific principles and methodology used by appellee's experts are not generally accepted, nor are the ultimate opinions upon which they relied. As noted above, Dr. Lange's opinion that ciguatera caused GBS was based upon his postulation that the prolonged activation of the sodium channels in the nerve by the ciguatera toxin would probably result in the distortion of those channels, causing the body to form antibodies directed against the sodium channels themselves. However, the biological plausibility of this theory of causation is not generally accepted within the medical community. In fact, when asked whether his opinion was based upon underlying principles that have been established and accepted by physicians with knowledge in this field, all Dr. Lange could say was "I believe so." (Emphasis added).
While Dr. Lange pointed to several articles which he maintained supported the principles upon which he relied, the articles themselves reveal that the postulate upon which Dr. Lange's opinion is based is considered speculation.[3] Although this court cannot be expected to comprehend every detail of the complex biology associated with the methodology set forth in the articles relied upon by Dr. Lange, when one of the authors of the articles refers to the hypothesis he proposes (and relied upon by Dr. Lange) as "speculative," this is no basis for finding the methodology as generally accepted in the scientific community. Dr. Lange also relied on an article to show the commonalities between ciguatera and GBS, when in fact the article showed their difference describing ciguatera as a cause of prolonged sodium channel activation while it lists GBS as a cause of sodium channel inactivation. See Ludwig Gutmann, Axonal Channelopathics: An Evolving Concept in the Pathogenesis of Peripheral Nerve Disorders, 47 Neurology 18, 19 (July 1996).
In another article relied upon by Dr. Lange, the author reported that a person bitten by a poisonous snake contracted GBS. See Tien-Yow Chuang, Guillain-Barré Syndrome: An Unusual Complication After Snake Bite, 77 Arch Phys. Med. Rehabil. 723 (July 1996). Dr. Lange used the article to show that toxins can cause GBS. However, nothing in the article supported his explanation of the scientific methodology as to how this toxin (ciguatera) could cause GBS. Further, there was no proof submitted that snake toxins behaved similarly to ciguatera. Finally, the article postulated that the GBS could have resulted from the administration of the anti-venom serum to the patient, rather than the toxin itself, in much the same way that some vaccines are a known trigger for GBS. See id. at 724.
A final article relied upon by Dr. Lange did offer a differential diagnosis of GBS in a patient after ciguatera poisoning, but the article later ruled out the conclusion. See Giuliano Sozzi, Polyneuropathy Secondary to Cigautoxin Poisoning, Ital. J. Neurol. Sci., 491, 494 (1988). Moreover, the article again offered no methodology supporting Dr. Lange's theory. There were other articles presented to the court, but none support the scientific principles upon which Dr. Lange's theory was based.
With respect to Dr. Lopez, his testimony conflicted with Dr. Lange's as to the methodology and principles of his opinion. While Dr. Lange testified that the ciguatoxin holds the sodium channel open, distorting the channel and causing the formation of antibodies, Dr. Lopez testified *549 differently. He hypothesized that the antibodies are created because the body detects the ciguatoxin itself, and these antibodies, in attacking the ciguatoxin, also attack the myelin of the nerve. While he said that the principles were generally accepted, he did not cite any authority for this proposition, and he admitted that there was no proof that a human body can develop antibodies to ciguatoxin. He also testified that the ciguatoxin blocks the sodium channel by binding to it. This was contrary to the testimony of Dr. Lange, who, along with the appellant's experts, stated that the ciguatoxin produces channel activation or opening.
What is apparent from the testimony is that the two experts directly contradicted each other as to the alleged general scientific principles applicable to their opinions. In Brim I, the supreme court noted that "two conflicting principles or theories cannot simultaneously satisfy the Frye test." 695 So.2d at 272. As Judge Altenbernd explained in Brim II. In the instant case, Frye is clearly not met when inconsistent scientific principles are used to justify the same conclusion.
Appellee's brief states as to both her experts, "[t]he opinions were rendered based upon underlying medical principles that have been established and accepted by physicians with knowledge in the respective fields." For this proposition, appellee cites to the testimony of Dr. Lange and Dr. Lopez themselves. This is tantamount to saying that because the court qualifies a witness as an expert, and the expert testifies to the methodology and opinion, it therefore is accepted in the field. Of course, such a proposition is nowhere supported in the law and is completely contrary to Frye. The trial court should have excluded the testimony.
Our view of the inadmissibility of this evidence is supported by analogous cases. For example, in Cartwright v. Home Depot U.S.A., Inc., 936 F.Supp. 900 (M.D.Fla. 1996), the court faced a similar factual scenario to the one at bar. The plaintiffs alleged that the defendant's latex paint had caused their asthma. There were no epidemiological studies relating latex paint to asthma. Also, the plaintiff's expert relied on his review of scientific literature to support his conclusion that latex paint causes asthma, yet none of the four articles so stated. There were many other painters who had been exposed to latex paint, yet there were no accounts or case studies relating asthma to their use of latex paint. While the court analyzed the admissibility of the expert's testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (the federal standard that replaced Frye), one of the factors under Daubert is the general acceptance in the relevant scientific community (i.e., Frye). The court concluded that the plaintiff's experts' analysis and opinions were not generally accepted within the relevant scientific community and therefore found them to be inadmissible. See id. at 905-06.
Similarly, in this case, the plaintiff proffered no epidemiological studies demonstrating causation between ciguatera and GBS. The plaintiffs experts relied on several articles, none of which supported their conclusion that ciguatera can cause GBS. Also, despite the numerous cases of ciguatera poisoning, the experts all admitted that this was the first in reported history that was connected to GBS.
While appellee's experts relied on temporal proximity in their causation opinion, mere reports in medical literature and the temporal proximity between the antecedent illness and GBS were insufficient bases for offering an opinion to a jury on *550 causation. See Willert v. Ortho Pharm. Corp., 995 F.Supp. 979 (D.Minn.1998). Temporal proximity, standing alone, is insufficient to support causation, particularly in the instant case where the appellee tested positive for a known cause of GBS.
For the foregoing reasons, we conclude on de novo review that the scientific principles and methodology used by the experts to arrive at their opinion of causation were not generally accepted in the relevant scientific community and were actually based upon contradictory principles. As such, they did not pass the Frye test. The trial court erred in refusing to exclude the evidence and in failing to direct a verdict for appellant on the causation issue. As relief, appellant requested only a reduction of the judgment by the amount of damages caused by GBS, which were specifically itemized in the jury verdict. We therefore reverse for entry of a judgment eliminating those damages from the judgment.
STONE, J., and GLICKSTEIN, HUGH S., Senior Judge, concur.
NOTES
[1] Because appellant's initial brief provides an excellent explanation of the biology and science involved, upon which only marginal additions are needed, we quote extensively from the facts in the brief.
[2] An appellate court's de novo review of a Frye issue "includes an examination of three methods of proof: (1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions." Berry v. CSX Transp., Inc., 709 So.2d 552, 557 (Fla. 1st DCA 1998), rev. denied, 718 So.2d 167 (Fla.1998) (citing Flanagan v. State, 586 So.2d 1085, 1112 (Fla. 1st DCA 1991)).
[3] It was extremely helpful to our review that the relevant scientific publications to this issue were all filed in the record below.