816 So.2d 1113 (2001)
HOLY CROSS HOSPITAL, INC., d/b/a Holy Cross Medical Group, and Salvatore DiGiorgi, M.D., Appellants/Cross-Appellees,
v.
Eleanor MARRONE, Appellee/Cross-Appellant, and
Melbourne J. Smith, M.D., Appellee.
No. 4D01-1140.
District Court of Appeal of Florida, Fourth District.
December 19, 2001.
Opinion on Grant of Clarification March 20, 2002.
Opinion on Denial of Clarification May 17, 2002.
*1115 Louise McMurray and Michael A. Petruccelli of Mcintosh, Sawran, Peltz & Cartaya, P.A., Miami, for appellants/cross-appellees.
Julie H. Littky-Rubin of Lytal, Reiter, Clark, Fountain & Williams, LLP, West Palm Beach, for appellee/cross-appellant.
POLEN, C.J.
Holy Cross Hospital, Inc., and Salvatore DiGiorgi, M.D., timely appeal a jury verdict of $900,000 in favor of Eleanore Marrone in a medical malpractice action. Dr. DiGiorgi contends the court committed reversible error in receiving testimony of one of Mrs. Marrone's expert witnesses without first conducting a Frye[1] hearing. We agree, and thus, reverse.
This medical malpractice action arose from Dr. DiGiorgi's alleged negligent misdiagnosis of Mrs. Marrone's lung cancer *1116 before 1999. Mrs. Marrone had been visiting Dr. DiGiorgi since 1994, in his capacity as a cardiologist, to help her oversee a preexisting valve disorder. Annual visits followed each year from 1996-1999, at which Dr. DiGiorgi took chest x-rays as part of the examination. On each occasion Dr. DiGiorgi informed Mrs. Marrone that everything was fine. However, two weeks after the 1999 visit, he contacted Mrs. Marrone, recommending that she get a follow-up CAT scan. Mrs. Marrone learned she had lung cancer and needed surgery.
Mrs. Marrone subsequently brought suit against Holy Cross Hospital, Dr. DiGiorgi, and radiologist Melbourne Smith, M.D., alleging that DiGiorgi and Smith had failed to diagnose her lung cancer in 1997 and/or 1998. Specifically, Marrone alleged that her lung tumor had been visible on her 1997/1998 x-rays, and should have been detected before 1999. At trial, the expert testimony clearly established that Dr. DiGiorgi had breached the standard of care owed to Mrs. Marrone, by reading her x-rays himself instead of sending them to specialist. Yet, the issue of causation was hotly contested.
Dr. DiGiorgi argued that his breach of the standard of care, i.e., failing to properly read Mrs. Marrone's x-ray, did not proximately cause her any damage. When removed in 1999, Mrs. Marrone's tumor represented a T1N1M0 cancer.[2] Dr. DiGiorgi argued Marrone would have needed surgery anyway had her tumor been detected in 1997/1998, and further, that the surgery performed in 1999 was no more invasive than it would have been in 1997/1998. Mrs. Marrone offered the expert testimony of Dr. Gerald Sokol to refute this assertion. Dr. Sokol stated he could determine within a reasonable degree of medical certainty when Mrs. Marrone's lung cancer had spread to her lymph nodes. Dr. DiGiorgi vigorously objected to the allowance of Dr. Sokol's expert testimony. Specifically, he contended that any opinion Dr. Sokol would provide was based on new and novel scientific principles and, therefore, should be subjected to a preliminary Frye hearing. Mrs. Marrone responded that Dr. Sokol's testimony would consist of his "pure opinion," based upon his clinical experience and training, and therefore was not subject to Frye. The trial court denied the request to conduct a Frye hearing, allowing Dr. Sokol to state his opinion, providing his opinions could be "adequately explored" on cross-examination.
In forming his opinion, Dr. Sokol relied entirely on the representations of another expert, Dr. Cohen, who had estimated that Marrone's tumor as represented on the x-rays had grown from approximately 1.3 cm. in 1997, to 1.6 cm. in 1998, to 2.5 cm. in 1999 before it was removed. Dr. Sokol opined that it was more likely than not that Marrone's cancer had spread to her lymph nodes some time after 1998. Dr. Sokol explained his reasoning as follows:
"We know from lots of data which I'm sure we are going to go over that when a tumor is small that the chances of lymph nodes being involved is small so most of those patients are cured. As the tumor gets bigger, the chance of the lymph nodes being involved gets greater, and we know that from lots of staging studies." (Emphasis added.)
*1117 Dr. Sokol's testimony was crucial in that it provided the only evidence that Dr. DiGiorgi's misdiagnosis had proximately caused her damages. Specifically, according to Dr. Sokol, Marrone's cancer more likely than not had been a T1N0M0 in 1997/1998, and Dr. DiGiorgi's failure to diagnose her cancer before 1999 had allowed her cancer to progress to a more advanced stage, T1N1M0 (Stage II), undetected. With a T1N1M0 tumor, Marrone only had a 35-40% chance of survival; had Marrone been operated on when her tumor was still T1N0M0 (no lymph node involvement), her projected survival rate would have been 60-80%.[3] It was this aggravation of Marrone's pre-existing injury which constituted the legally cognizable damages caused by DiGiorgi's misdiagnosis.
On cross-examination, Sokol was pressed at length to state the basis for his opinion. Dr. Sokol vacillated, stating first that his opinion was based on "a lot of studies done in staging cancers," but later responding that he was basing his opinion, "on all (his) training and experience, and it includes that (staging studies)."
Dr. DiGiorgi's challenge on appeal that Dr. Sokol's testimony should have been subjected to a Frye hearing is reviewable by this court de novo. Hadden v. State, 690 So.2d 573 (Fla.1997). Frye holds that in order to introduce expert testimony deduced from a scientific principle or discovery, the principle or discovery "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014; Flanagan v. State, 625 So.2d 827 (Fla.1993)(holding novel scientific evidence is not admissible unless it meets the test established by Frye). Yet, the Frye test is not applied to pure opinion testimony, which is based upon the expert's training and clinical experience. Flanagan, 625 So.2d at 827-8(noting an expert's pure opinion testimony comes cloaked with the expert's credibility and the jury can evaluate this testimony in the same way it evaluates other opinion or factual testimony); Florida Power & Light Co. v. Tursi, 729 So.2d 995 (Fla. 4th DCA 1999). Thus, we must first determine at the threshold, whether Dr. Sokol's testimony was "pure opinion." We hold it is not.
"Pure opinion" refers to expert opinion developed from inductive reasoning based on the experts' own experience, observation, or research, whereas the Frye test applies when an expert witness reaches a conclusion by deduction, from applying new and novel scientific principle, formula, or procedure developed by others. Kuhn v. Sandoz Pharmaceuticals Corp., 270 Kan. 443, 14 P.3d 1170, 1179-80 (discussing Florida Power, 729 So.2d at 997). Though Dr. Sokol was careful to testify that his opinion was based on his personal experience and training, we must examine his entire testimony in order to determine whether it actually is "pure opinion." Irving v. State, 705 So.2d 1021, 1023; Hadden, 690 So.2d at 580-81. Upon review of the record, it is clear that Dr. Sokol's opinion was at least in part derived from conclusions drawn from staging studies done by others. See Hadden, 690 So.2d at 579-81 (finding the expert's opinion was based not only upon his experiences, but also on syndromes and related diagnostic criteria, and because the syndrome evidence relied upon conclusions based upon studies and tests, the expert's opinion had *1118 to pass the Frye test); cf. Florida Power, 729 So.2d at 996-98 (holding Frye test did not apply where ophthalmologist testified one time exposure to transformer liquid caused plaintiffs cataract that developed four years later at the site of the trauma, based solely on his experience and training that chemical agents in general [not necessarily the agent in question] could cause cataracts, after he had ruled out all other natural causes).
Having determined that Dr. Sokol's testimony was not based on his "pure opinion," we next address whether his testimony concerns "new and novel" scientific principles. We find that it does. Here, Dr. Sokol testified that he could use statistics from staging studies to determine when in time Marrone's lymph nodes became involved. Marrone argues that there is nothing "new and novel" about staging studies, and Dr. Sokol's mere reference to "facts" from these established studies should not trigger the Frye threshold. We disagree.
What was challenged below, and what we believe needed to be Frye tested was, Dr. Sokol's application of staging studies. See Ramirez v. State, 651 So.2d 1164 (Fla.1995)(holding under Frye the proponent must establish the general acceptance of both the underlying scientific principle and the testing procedure used to apply that principle to the facts of the case at hand); Cella v. United States, 998 F.2d 418, 425 (7th Cir.1993)("the Frye standard requires that the methodology and reasoning used by an expert in reaching a conclusion be generally accepted within the relative scientific community"). Staging cancer consists of grouping together three characteristics of a patient's existent cancer (T, N, M), in order to help the patient's physician demarcate the spectrum of available future treatment options. Here, Dr. Sokol, attempted to utilize staging studies in a "new and novel" manner, namely, to go back in time and determine when a tumor spread to a lymph node.[4] Dr. Sokol had never examined Marrone or the excised tumor. His opinion was purportedly derived from scientific studies; we hold his methodology needed to be Frye tested. See Flanagan, 625 So.2d at 828 (noting where expert's testimony necessarily relies on some scientific principle or test, the jury will naturally assume that the scientific principles underlying the expert's conclusion are valid); Cf. Cudone v. Gehret, 828 F.Supp. 267, 270-72 (D.Del.1993)(finding greater weight of evidence established that breast cancer misdiagnosis had caused damages, i.e., lymph node involvement, where four of five doctors opined that to a reasonable degree of medical probability there had been no nodal involvement when misdiagnosis occurred, noting one doctor had arrived at his conclusion based on microscopic examination of the lymph node in question, which he had removed during surgery, that revealed a very early form of pathology).
Courts in Florida employ a four-step process in determining the admissibility of expert testimony concerning a "new *1119 and novel" scientific theory or principle. First, the trial judge must determine whether the expert testimony would assist the jury in understanding the evidence or in determining a fact in issue. Second, the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," commonly referred to as the Frye test. Ramirez, 651 So.2d at 1167; Frye, 293 F. at 1013-14. In order to make this determination, the court should generally conduct an evidentiary hearing. See Id. at 1168(noting a hearing on the admissibility of novel scientific evidence is an adversarial proceeding in which conflicting evidence is presented to the trial judge as the trier of fact); but see U.S. Sugar Corp. v. Henson, 787 So.2d 3, 21 (Fla. 1st DCA 2001)(noting while a separate evidentiary hearing is the usual process, it is not mandatory).
In this case, the trial court did not conduct an evidentiary hearing on the disputed scientific issues, an omission that has a direct bearing on our review of the matter. In our de novo review, we must examine "expert testimony, scientific and legal writings, and judicial opinions" to determine whether the expert testimony in question has been generally accepted. Hadden, 690 So.2d at 578; Brim v. State, 779 So.2d 427, 434 (Fla. 2d DCA 2000). Here, the record before this court is simply inadequate to make a reasoned assessment of the general acceptance of Dr. Sokol's methodology. On appeal, only the appellant has provided this court with any scientific references pertinent to this determination. However, it would be patently unjust to rule on such a complex issue solely based on excerpted materials provided by one of the parties. Cf. Kaelbel Wholesale, Inc. v. Soderstrom, 785 So.2d 539, 548 n. 3 (Fla. 4th DCA 2001)(noting it was extremely helpful to the court's review that the relevant scientific publications were filed in the circuit court record). Furthermore, there is a dearth of judicial opinions addressing this specific admissibility challenge before this court, and we cannot hold that judicial opinions establish whether or not Dr. Sokol's testimony has been "generally accepted."[5]
Finally, our review of the expert testimony does not lend support to the general acceptance of Dr. Sokol's testimony, where no other expert opined that staging studies could be utilized to determine when the cancer spread to Ms. Marrone's lymph node. See Crawford v. Shivashankar, 474 So.2d 873 (Fla. 1st DCA 1985)(noting the fact an expert witness merely states that his testimony is generally accepted does not make them so for the purpose of Frye analysis).
Accordingly, we remand to the circuit court with directions to conduct an evidentiary Frye hearing regarding Dr. Sokol's testimony. We note that the circuit court's inquiry at this hearing is limited to determining whether the general acceptance of the scientific principles and methodology used has been established; there is no legal requirement that the expert's *1120 opinion itself be generally accepted as well. See Berry v. CSX Transportation, Inc., 709 So.2d 552, 567 (Fla. 1st DCA 1998); see also Ramirez, 651 So.2d at 1167 (noting Frye is solely concerned with threshold determination of admissibility focusing on reliability, and once the judge allows the expert to render an opinion it is then up to the jury to determine the credibility of the expert's opinion, which it may either accept or reject).
Though we are reversing the jury verdict and remanding for a Frye hearing and a new trial, we will briefly address two other issues raised on appeal because of the possibility they will recur on retrial. Assuming arguendo that Dr. Sokol's testimony had been properly admitted, DiGiorgi further contends that Ms. Marrone has failed to establish proximate causation of a legally cognizable claim under the standard established in Gooding v. University Hospital, Inc., 445 So.2d 1015 (Fla.1984). We disagree.
In Gooding, our supreme court reversed a wrongful death verdict, holding the plaintiff had failed to prove that what was done by the defendants probably would have affected the outcome, i.e., the decedent's death, and had merely established a non-compensable "loss of a chance to survive." Id. at 1020-21. DiGiorgi contends Ms. Marrone has merely alleged a loss of her chance to survive, i.e., her decreased expected survival rate. We disagree.
Here, Ms. Marrone alleged that Dr. DiGiorgi's negligent misdiagnosis of her cancer caused an aggravation of her pre-existing condition. This is a legally cognizable claim. See Swain v. Curry, 595 So.2d 168, 170 (Fla. 1st DCA 1992)(holding once an injury has been established, plaintiff could seek damages for increased risk of cancer, decreased chance of survival, and reduction in life expectancy); Auster v. Gertrude and Philip Strax Breast Cancer Detection Institute, Inc., 649 So.2d 883, 887-8(Fla. 4th DCA 1995)(holding delay in cancer diagnosis is a concurring cause that may give rise to liability for aggravation of a pre-existing condition).
We also address Ms. Marrone's contention that the court should not have allowed the jury to apportion fault to the non-party defendant, Dr. Smith, who had reached a settlement with Ms. Marrone before trial. We hold the court did not err in allowing the jury to apportion fault to Dr. Smith, where the record reflects that Smith and DiGiorgi were joint and not successive tortfeasors. Chesterton v. Fisher, 655 So.2d 170 (Fla. 3d DCA 1995); cf. Gross v. Lyons, 763 So.2d 276 (Fla.2000).
REVERSED AND REMANDED FOR NEW TRIAL.
GUNTHER and WARNER, JJ., concur.

ON MOTIONS FOR REHEARING, CLARIFICATION, CERTIFICATION, AND REHEARING EN BANC
POLEN, C.J.
We deny appellee's Motions for Rehearing, Rehearing En Banc, and Certification, but grant her Motion for Clarification, supplementing our Slip Opinion filed December 19, 2001, solely to the limited extent discussed, infra. In our December 19 opinion we reversed the jury verdict where the trial court had failed to conduct a Frye[1] hearing before the admission of Dr. Sokol's testimony. On remand we directed the trial court to conduct a new trial, where it would have to hold a Frye hearing before allowing the admission of Dr. Sokol's testimony. Based on our holding in Arnold v. State, 807 So.2d 136 (Fla. *1121 4th DCA 2002), we recede from our previous direction to the following extent. Upon remand the trial court is to hold a Frye hearing in accordance with our December 19 opinion. If at the conclusion of the hearing, the trial court determines there was sufficient basis to admit Dr. Sokol's testimony, the trial court should reinstate the jury verdict in favor of appellee Eleanor Marrone. If the trial court determines that Dr. Sokol's evidence was inadmissible under Frye, the trial court should order a new trial. The remand is limited solely to this issue, and we direct the hearing be held on this matter within 60 days from the date of this opinion becomes final.
GUNTHER and WARNER, JJ., concur.

ON MOTION FOR CLARIFICATION
PER CURIAM.
Appellant's Motion for Clarification is hereby denied to the extent it moves this court to revisit the directions previously ordered upon remand. Notwithstanding, we write to further refine our previous holdings in the instant case.
Appellant contends if the trial court finds Dr. Sokol's opinion testimony inadmissible under Frye[1], the trial court should enter a directed verdict in appellant's favor. We disagree.
Here, appellee disclosed Dr. Sokol as a trial expert, namely an expert oncologist, on August 2, 2000. Trial was set on an expedited basis due to the fact Mrs. Marrone had been diagnosed with cancer. Dr. Sokol was not deposed by appellant until December 29, 2000, less than two weeks before the commencement of trial. Appellant's memorandum in support of the exclusion of Dr. Sokol's testimony on the basis of Frye was subsequently filed the first day of trial, January 9, 2001.
As a matter of course, where a Frye-type admissibility issue is raised, a hearing on the merits of this issue should be held before trial. We note on the aforementioned facts, such was an impossibility; we expressly do not attribute any fault to Judge Brescher whose actions were reasonable given the extenuating circumstances.
Notwithstanding, we refine our directions on remand as provided in our Opinion on Grant of Clarification issued March 20, 2002. Upon review of the record, we note not all of Dr. Sokol's opinion testimony is subject to the threshold test of Frye. As a litany of cases have provided, only evidence based on "new and novel" scientific techniques is subject to Frye. As this court previously held in our original opinion filed December 19, 2001, Dr. Sokol's usage of staging studies, and to the extent his subsequent conclusions were derived therefrom, constituted a "new and novel" application of scientific datum, and, as such, needed to be Frye-tested. Yet, we conclude, as a matter of law, a large portion of Dr. Sokol's testimony offered below constitutes "pure opinion." See Florida Power & Light Co. v. Tursi, 729 So.2d 995 (Fla. 4th DCA 1999). There is no question as to Dr. Sokol's competency as an expert in the field of oncology. For example, his general discussion regarding the growth and history of tumors and the spread of cancer, to the extent such testimony is based on his experience and training and as it relates to Mrs. Marrone's condition, is admissible as opinion testimony. As a general rule, the ultimate determination(s) regarding whether or not appellant's alleged negligence in failing to timely diagnose Mrs. Marrone's cancer *1122 acted in concert with her preexisting condition to produce an injury, and if so, to what extent (i.e., apportionment of damages), are matters to be decided by the jury. See Auster v. Gertrude and Philip Strax Breast Cancer Detection Institute, Inc., 649 So.2d 883, 887-8 (Fla. 4th DCA 1995).
On remand the trial court shall have the task of determining whether Dr. Sokol's testimony as it relates to staging studies, and conclusions derived therefrom, are admissible under Frye. If the trial court holds all of Dr. Sokol's testimony is admissible (including testimony relating to staging studies), the jury verdict entered below shall be reinstated. On the other hand, if the trial court holds Dr. Sokol's testimony relating to staging studies is inadmissible under Frye, the trial court shall order a new trial. In this regards, the trial court shall exercise its discretion in determining what portions of Dr. Sokol's testimony shall be excluded if he is offered as an expert witness at the new trial.
GUNTHER and WARNER, JJ., concur.
POLEN, C.J., concurs specially with opinion.
POLEN, C.J., concurring specially.
I concur with the majority opinion and write specially solely to further clarify the procedure to be employed where Frye issues are raised, and why policy dictates the result discussed, supra, in the instant case.
The majority properly notes a pre-trial Frye hearing was an impossibility in the instant case. Litigation is indeed a curious animal and one cannot readily discern from the record whether this situation was the result of the action of one or both of the parties below, or merely a result of the complex nature of this case, which was set on an expedited schedule.
Notwithstanding, in most cases a hearing concerning Frye-type admissibility issues can, and should, be raised before trial. In that instance, where a hearing regarding the applicability of Frye is addressed a sufficient amount of time before trial, if a party learns the opinion of one of its experts will not be admissible, that party will at the least have the ability to undertake curative actions before trial. Where such is not a possibility due to extenuating scheduling circumstances, we do not believe a party should be penalized and lose its opportunity to act as if the more proper procedures had been followed, i.e., consideration of the Frye issue a sufficient time before trial. This, in turn, would require a party opposing anticipated testimony on Frye grounds to do its discovery and raise the issue by motion and hearing a sufficient amount of time prior to the trial setting. It seems unduly harsh not only to snatch victory from a party due to a procedural error of the trial court in declining to conduct a mid-trial Frye hearing, but also to maintain that party shall have no opportunity to proceed as if the trial court had made the correct ruling. Allowing appellee to attempt to establish her cause of action at a new trial (if Dr. Sokol's testimony is held to be partly inadmissible) would not constitute a proverbial "second bite of the apple." If Dr. Sokol's testimony were to be excluded, then appellee's "first bite" was ineffectual, as the trial court never afforded her the opportunity to prove her case through all alternative admissible means at her disposal.
NOTES
[1] Frye v. U.S., 293 F. 1013 (D.C.Cir.1923).
[2] T1N1M0 refers to a Stage I cancer. "T" refers to the size of the tumor (T1-4; T1:1-3cm.), "N" refers to the presence and site of lymph node involvement (N0-3), and "M" refers to the presence of spread to distant points within the body (M0=none, M1=identifiable metastases). These factors are combined into stages I-IV, with 5-year survival rates projected for each stage.
[3] DiGiorgi also raises on appeal that Marrone merely alleged a non-compensable "loss of chance" under Gooding v. University Hospital, Inc., 445 So.2d 1015 (Fla.1984). Though we are reversing on different grounds, we briefly address this issue for purposes of a possible future appeal, infra.
[4] Dr. Sokol represented he could apply "logic" to staging study statistics to determine when Marrone's lymph node became involved. In short, he reasoned people with "small" tumors generally survive, while people with involved lymph nodes (N1) generally don't, therefore people with small tumors generally don't have involved lymph nodes. This reasoning troubles the court, in light of the facts before us. The staging studies Dr. Sokol relies on do not differentiate between tumor sized 1-3 cm., which are all grouped together as T1. Here we are dealing with a tumor that was purportedly 1.6 cm. in 1997 and 2.5 cm. in 1999. We believe Dr. Sokol's methodology should be fleshed out in a Frye hearing to ensure its reliability. See Ramirez, 651 So.2d at 1167-8.
[5] To our knowledge, only one case has addressed a similar admissibility challenge, Greer v. Lammico, 779 So.2d 894 (La.App. 2 Cir.2000). Greer allowed an expert to give testimony regarding the spread of a tumor, relying in part on breast cancer staging literature. Greer was decided under the Daubert standard of admissibility, which focuses on whether the expert's opinion is "relevant and reliable." See State v. Foret, 628 So.2d 1116 (La.1993)(noting Frye "general acceptance" is only a factor in the Daubert analysis). Also, the experts in Greer had the benefit of medical tests performed five months prior to the tumor's removal which indicated the tumor had not yet spread.
[1] Frye v. U.S., 293 F.1013 (D.C.Cir.1923).
[1] Frye v. U.S., 293 F.1013 (D.C.Cir.1923).